IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,       )
                                    )
        Plaintiff,             )
                                      )
        v.                   )     Civil No. <u>1:10-CV-</u>0858 (FJS/DRH)
                                      )
THE STATE OF NEW YORK and     )
THE NEW YORK STATE OFFICE OF   )
CHILDREN AND FAMILY SERVICES,  )
                                    )
        Defendants.       )

## COMPLAINT

PLAINTIFF, THE UNITED STATES OF AMERICA ("Plaintiff"), by its undersigned attorneys, hereby alleges upon information and belief:

1.    The United States files this Complaint pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, to enjoin the Defendants from depriving youths confined in the Finger Lakes Residential Center ("Finger Lakes") and Lansing Residential Center ("Lansing") in Lansing, New York, and the Tryon Residential Center ("Tryon Boys") and the Tryon Girls Center ("Tryon Girls") in Johnstown, New York, of rights, privileges, or immunities secured and protected by the Constitution and laws of the United States.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

3.    The United States is authorized to initiate this action pursuant to 42 U.S.C. § 14141.

4.    Venue in the United States District Court for the Northern District of New York is proper pursuant to 28 U.S.C. § 1391.

## DEFENDANTS

5.    Defendant STATE OF NEW YORK ("State") is responsible for the administration of juvenile justice in the State and operates, or contracts for the operation of, all juvenile justice facilities in the State.  This action concerns the administration of Finger Lakes, Lansing, Tryon Boys, and Tryon Girls (collectively, "Facilities"), which house in State custody youth who are confined for periods of time established by the juvenile courts.

6.    Defendant NEW YORK STATE OFFICE OF CHILDREN AND FAMILY SERVICES is the State agency responsible for the care and custody of youth confined at the Facilities.

## FACTUAL ALLEGATIONS

7.    Defendants are legally responsible, in whole or in part, for the operation and conditions of the Facilities, and for the health and safety of the youth confined at the Facilities.

8.    Defendants are governmental authorities with responsibility for the administration of juvenile justice or the incarceration of juveniles within the meaning of 42 U.S.C. § 14141.

9.    Defendants are obligated to operate the Facilities in a manner that does not infringe upon the federal rights, as protected by the Fourteenth Amendment to the Constitution of the United States and by other federal law, of individuals confined at the Facilities.

10.    At all relevant times, Defendants have acted or failed to act, as alleged herein, under color of state law.

11.    Defendants have disregarded known or serious risks of harm to youths at the Facilities, as detailed in the letter issued by Acting Assistant Attorney General Loretta King on August 14, 2009, describing the investigative findings of conditions at the Facilities ("Findings Letter"). The Findings Letter is appended to this Complaint as Attachment A and is incorporated by reference herein.

12.    As outlined in the Findings Letter, Defendants have failed to take reasonable measures to prevent staff from inflicting serious harm on youths, despite the substantial risk that staff will inflict such harm and the multiple occasions on which staff in fact have inflicted such harm.

13.    As outlined in the Findings Letter, Defendants have failed to provide adequate mental health care and services to youths by inadequately assessing and administering to youths' acute and chronic psychiatric conditions, resulting in risk

of serious harm and multiple occasions on which confined youths have in fact suffered such harm.

14.     The allegations set forth in paragraphs 7 through 13 and outlined in the Findings Letter have been known to Defendants for a substantial period of time, yet Defendants have failed to adequately address the conditions described.

## VIOLATIONS ALLEGED

15.     The United States incorporates by reference the allegations set forth in paragraphs 1 through 14 as fully set forth herein.

16.     The acts and omissions alleged in paragraphs 7 through 14 and outlined in the Findings Letter constitute a pattern or practice of conduct that violates the federal rights, as protected by the Fourteenth Amendment to the Constitution of the United States and by other federal law, of youths confined in the Facilities.

17.     Unless restrained by this Court, Defendants will continue to engage in the acts and omissions, set forth in paragraphs 7 through 14 and outlined in the Findings Letter, that deprive youths confined in the Facilities of the rights, privileges, or immunities secured or protected by the Constitution of the United States and federal law, and will cause irreparable harm to these youths.

## PRAYER FOR RELIEF

18.     The Attorney General is authorized, pursuant to 42 U.S.C. § 14141, to seek equitable and declaratory relief.

WHEREFORE, the United States prays that this Court enter an order:

4

a.   declaring that the acts, omissions, and practices of Defendants set

forth in paragraphs 7 through 14 above and outlined in the Findings

Letter constitute a pattern or practice of conduct that deprives youths

at the Facilities of rights, privileges, or immunities secured or

protected by the Constitution of the United States or laws of the

United States, and that those acts, omissions, and practices violate

the Constitution and laws of the United States;

b.   permanently enjoining Defendants, their officers, agents,

employees, subordinates, successors in office, and all those

acting in concert or participation with them from continuing the

acts, omissions, and practices set forth in paragraphs 7 through

14 above and outlined in the Findings Letter and requiring

Defendants to take such actions as will ensure lawful conditions

of confinement are afforded to youths at the Facilities; and

c.   granting such other and further equitable relief as the Court

deems just and proper.

Respectfully submitted,

s/Thomas E. Perez
THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division


s/Samuel Bagenstos
SAMUEL R. BAGENSTOS
Principal Deputy Assistant
 Attorney General
Civil Rights Division


s/Judy C. Preston
JUDY C. PRESTON
Acting Chief
Special Litigation Section


s/Julie K. Abbate
JULIE K. ABBATE
Acting Deputy Chief
Special Litigation Section


s /Alyssa C. Lareau
ALYSSA C. LAREAU
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
PHB 5519
Washington, DC 20530
Phone:  (202) 305-2994
Facsimile:  (202) 514-4883
Email:  Alyssa.Lareau@usdoj.gov

# Attachment A



**U.S. Department of Justice**

Civil Rights Division

Office of the Assistant Attorney General                          Washington, D.C. 20530

AUG 1 4 2009

The Honorable David A. Paterson
Governor of New York
State Capitol
Albany, New York  12224

Re:   Investigation of the Lansing Residential Center, Louis Gossett, Jr.
      Residential Center, Tryon Residential Center, and Tryon Girls Center

Dear Governor Paterson:

I write to report the findings of the Civil Rights Division's investigation of
conditions at four Office of Children and Family Services ("OCFS") facilities:
Lansing Residential Center ("Lansing"), Louis Gossett, Jr. Residential Center
("Gossett"), Tryon Residential Center ("Tryon Boys"), and Tryon Girls Residential
Center ("Tryon Girls"). On December 14, 2007, we notified you of our intent to
conduct an investigation of the juvenile facilities pursuant to the Civil Rights of
Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA"), and the Violent Crime
Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"). We
informed you that our investigation would focus on whether youth were adequately
protected from harm, and would specifically address allegations of sexual
misconduct and unreasonable use of restraints. At the conclusion of our first set of
tours, we notified you that we would be expanding the scope of our investigation to
include mental health care at each of the four facilities.

On June 2-5, June 30-July 3, November 12-14, and November 24-26, 2008,
we conducted on-site inspections of the facilities. On our first set of tours, we were
accompanied by expert consultants in protection from harm and use of force, and on
our second set we were accompanied by expert consultants in mental health care.
Before, during, and after our tours, we reviewed an extensive number of documents
including policies and procedures, incident reports, medical and psychology records,
unit logs, and training materials. Additionally, we interviewed administrators,
professionals, staff, and youth. We observed the youth in a variety of settings,
including on their living units, while dining, in classrooms, and during recreation.
Consistent with our commitment to provide technical assistance and conduct a
transparent investigation, we conducted exit conferences upon the conclusion of

- 2 -

each set of tours, during which our expert consultants conveyed their initial impressions and concerns.

We thank the staff from OCFS and each of the facilities for their helpful and professional conduct throughout the course of the investigation. We received complete cooperation and appreciate their receptiveness to our consultants' on-site recommendations. Attorneys and staff assisted our investigation by providing us with unfettered access to records and personnel, and responding to all of our requests in a transparent and forthcoming manner. We have every reason to believe that OCFS and facility administrators are committed to remedying deficiencies at the facilities.

Consistent with our statutory obligation under CRIPA, we set forth below the findings of our investigation, the facts supporting them, and the minimum remedial steps that are necessary to address the deficiencies we have identified. As described below, we conclude that the conditions at Lansing, Gossett, Tryon Boys, and Tryon Girls violate constitutional standards in the areas of protection from harm and mental health care.

In the course of our investigation, we also reviewed allegations of custodial sexual misconduct. We find no current systemic constitutional deficiencies in this area. In the wake of custodial sexual misconduct charges at the facilities, OCFS has taken multiple steps, including but not limited to installing video cameras, increased staff accountability, and additional training for staff in order to safeguard youth at the facilities. We commend OCFS for the steps it has taken and encourage it to continue its work to minimize such risks and ensure youth safety.

I.   BACKGROUND

A.   Description of the Facilities

OCFS operates 31 residential juvenile justice facilities throughout New York State. Residential facilities house court-placed youths according to three different security designations: secure (most restrictive), limited-secure, and non-secure (least restrictive). Our investigation focused on the following four facilities.

1.   Louis Gossett, Jr. Residential Center

Gossett is a limited-secure facility for male youth located outside of Ithaca, New York. All services are centralized in one large building, including youth housing, programming (e.g., school, dining, medical services, recreation), and administration. There are ten housing units with fifteen beds per unit. Each youth is assigned to an individual room on the perimeter of a large dayroom. Each

- 3 -

housing unit has a large unit office where staff often meet with youth. Housing units are assigned according to education level, except one unit which houses youth in the Community Reintegration Program. This program is for youth who were placed previously in the State's residential facilities, but then re-offended and were re-committed. During our June tour of Gossett, the census was 128 youths. During the November tour, the census was 131 youths.

### 2.   Lansing Residential Center

Lansing is a residential facility for female youth located adjacent to Gossett. In January 2008, Lansing's security designation changed from limited-secure to non-secure. The campus consists of nine distinct buildings, three of which were utilized for housing at the time of our tours. The main, older multi-level building contains housing for less than 20 youth and includes a school, counseling offices, the cafeteria, and other services. There is also a newer, multi-structure area with cottage-style housing units and a school building. The housing units in this area have capacity for 16-17 youths each. Each housing unit is organized according to educational level. The rated capacity for the facility is 50 youths. During our June tour, Lansing housed 41 youths, and in November there were 36 youths.

### 3.   Tryon Residential Center

Tryon Boys is a limited-secure residential facility for male youth located outside of Johnstown, New York. Tryon Boys is a large campus with multiple buildings, including seven housing units in four cottage-style buildings and separate buildings for dining, school, medical services, and other services. There are two specialized housing units, Elmwood 2 and Briarwood 2. Elmwood 2 is designated as housing for youth in the substance abuse treatment program. Briarwood 2 houses youth in the mental health treatment program. Notably, Tryon Boys also serves as a "hub" for youth in OCFS custody who are being transported between detention and residential centers. At times, youth being transported spend the night at Tryon Boys with the general population.

The facility has a capacity of 180 youths, but during our tours, the facility was far below that capacity. During the June/July tour, the total population was 103 youths. By the November tour, the total population had been decreased to 26 youth in order for the staff to attend training.

### 4.   Tryon Girls Residential Center

Tryon Girls is located adjacent to Tryon Boys and, like Tryon Boys, consists of multiple buildings and primarily cottage-style housing units. The campus includes several different security levels and programmatic housing: one secure

- 4 -

unit with 16 beds, one unit for youths in the Community Reintegration Program with 16 beds, several general limited-secure units with 16 beds each, and one mental health unit with nine beds. During our June/July tour, there were 54 youths. During the November tour, there were 50 youths.

### B.   Legal Background

CRIPA gives the Department of Justice authority to investigate and take appropriate action to enforce the constitutional rights and the federal statutory rights of juveniles in juvenile justice facilities. 42 U.S.C. § 1997. Section 14141 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, makes it unlawful for any governmental authority with responsibility for the incarceration of juveniles to engage in a pattern or practice of conduct that deprives incarcerated juveniles of constitutional or federal statutory rights. Section 14141 grants the Attorney General authority to file a civil action to eliminate the pattern or practice.

The Due Process clause of the Fourteenth Amendment to the U.S. Constitution governs the standards for conditions of confinement of juvenile offenders who have not been convicted of a crime. Garv H. v. Hegstrom, 831 F.2d 1430, 1432 (9th Cir. 1987); Jones v. Blanas, 393 F.3d 918, 931 (9th Cir. 2004). Confinement of youth in conditions that amount to punishment, or in conditions that represent a substantial departure from generally accepted professional standards, violates the Due Process clause. Youngberg v. Romeo, 457 U.S. 307 (1982); Bell v. Wolfish, 441 U.S. 520 (1979); Society for Good Will to Retarded Children, Inc. v. Cuomo, 737 F.2d 1239, 1245-46 (2d Cir. 1982)(extending Youngberg reasoning to children who are the responsibility of the state). The Fourteenth Amendment prohibits imposing on incarcerated persons who have not been convicted of crimes conditions or practices not reasonably related to the legitimate governmental objectives of safety, order, and security. Bell v. Wolfish, 441 U.S. at 539-540.

Youths in the custody of the State have a constitutional right to be free from physical abuse by staff and assaults inflicted by other youths. Youngberg, 457 U.S. at 315-16 ("personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause"). Juveniles also have the right to be free from excessive use of force by staff and unreasonable bodily restraints. Youngberg, 457 U.S. at 315-16; Rodriguez v. Phillips, 66 F.3d 470, 477 (2d Cir. 1995)(holding that Fourteenth Amendment ensures freedom from excessive use of force in non-arrestee, non-prisoner context); Alexander S. v. Boyd, 876 F. Supp. 773, 786 (D.S.C. 1995) (in absence of genuine risk of serious bodily harm to another, use of a form of tear gas on youth detainees merely "to enforce an order" violates Due Process).

- 5 -

Confined juveniles also must receive adequate medical treatment, including adequate mental health treatment and suicide prevention measures. See Youngberg, 457 U.S. at 323-24 & n.30; Martarella v. Kelley, 349 F. Supp. 575, 598 (S.D.N.Y. 1972) (holding that juvenile facilities operated by the State of New York were obligated to provide adequate treatment to youths in custody).

## II.   FINDINGS

### A.   Failure to Protect Youth From Harm

Youth at OCFS facilities have a right to be free from unnecessary restraint and the use of excessive force. Youngberg, 457 U.S. at 315-16. Our investigation revealed that: 1) staff resort quickly to a high degree of force that is disproportionate to the level of the youth's infraction; and 2) the technique employed to restrain a youth results in an excessive number of injuries. We also found that investigations into uses of force and restraints were inadequate and that, in many instances, OCFS failed to hold staff accountable for gross violations of OCFS policy on the use of force and restraints.

#### 1.   Use of Excessive Force and Inappropriate Restraints

Staff at the four facilities consistently used a high degree of force to gain control in nearly every type of situation. OCFS' policy on physical restraints appropriately limits "the use of physical restraint to exceptional circumstances when all other pro-active, non-physical behavior management techniques have been tried and failed." OCFS Use of Physical Restraint Policy, 3247.13, sec. I. Moreover, the policy provides that "when the use of physical restraint is necessary, staff shall employ only the minimum amount of physical control necessary to stabilize the youth/situation." Id. In practice, however, staff at the facilities routinely used uncontrolled, unsafe applications of force, departing both from generally accepted standards and OCFS policy. Anything from sneaking an extra cookie to initiating a fistfight may result in a full prone restraint with handcuffs.[1] This one-size-fits-all control approach has not surprisingly led to an alarming number of serious injuries to youth, including concussions, broken or knocked-out teeth, and spiral fractures.

---

[1]      A full restraint or full prone restraint is one of the OCFS-approved restraint techniques which staff explained and demonstrated for us during our tours. A full restraint involves staff ultimately placing the youth face down on the ground with his or her arms behind the back. The youth is frequently handcuffed by staff while in this position. By policy, the youth may not be handcuffed longer than thirty minutes.

### a.   Use of Excessive Force

Our investigation revealed that staff use excessive force to control youth's behavior. Staff at the four facilities have been trained to initiate the same response in any given situation regardless of the level of the youth's resistance to following directions. Further, the practices that staff use tended to escalate, rather than de-escalate, minor behavior problems into serious incidents. At Gossett, the practice is known as "pin pushing." By policy, this practice would not appear to be problematic; however, in application, it leads to a deviation from OCFS Use of Force Policy and excessive uses of force.

In general, "pin pushing" refers to staff pushing the button on their radios any time youth exhibit resistance to following directions. When staff push the pin, it triggers a response team that rushes to the location of the incident and is supposed to de-escalate the situation. In actuality, in many of the incidents we reviewed and observed during our tour, the team's actions actually intensified the tension to the point where a restraint was employed. As a result, a behavior such as pouring sugar into a glass of orange juice is just as likely to result in a restraint as initiating a fist-fight.

Staff are instructed to push the pin – thereby deploying a response team to the location – at even the slightest sign of resistence by a youth. For instance, Gossett's policy on "pin pushing" is set out in a memorandum to staff, which states as follows:

> This memo is to serve as a reminder and a warning[2] of the guidelines set forth, from both the Facility Director and Facility Policy.
>
> - If you "think," "feel," or "suspect" that you may have to use physical force - PUSH THE PIN.
>
> - If a resident is physically or verbally aggressive - PUSH THE PIN.
>
> - If a resident says "no" or demonstrates defiance in any manner - PUSH THE PIN.

Memorandum, dated December 18, 2007.

---

[2]   Use of the word "warning" seems to imply that staff will be punished for their failure to push the pin.

- 7 -

The procedure at Tryon Boys is slightly different insofar as staff use a very basic code system comprised of two codes: a Code Red, which signals a security emergency, and a Code White, which signals an emergency escort. Other than that, there appears to be no attempt to tailor the response to the particular situation.

Given its effect, and coupled with the liberal number of circumstances in which staff are instructed to push the pin, this procedure conflicts with OCFS policy limiting use of force to "exceptional circumstances." For example:

- Following a discussion with a YDA[3] on the unit, a youth went to his room, visibly upset, and slammed the door. The YDA pushed the pin and the response team arrived. They ordered the youth to come out of his room, and when he refused, the staff entered his room and used force to remove him. The youth sustained multiple head injuries, abrasions to both of his elbows, and suffered a nosebleed after staff forcibly removed him from his room.

- In another incident, a youth "stormed off" and slammed his door after an argument with a YDA over not being allowed to participate in a basketball game. The YDA pushed the pin and the response team arrived. The response team entered the youth's room, forcibly removed him, and restrained him. The youth sustained injuries to his left and right cheeks, his chin, and his neck.

- In yet another incident, the youth refused to get dressed until he was given the opportunity to shower. Staff pushed the pin and the response team arrived. The response team entered the youth's room and placed him in a full restraint. The youth was released and allowed to stand up, at which point he stepped toward a YDA and was again placed in a full restraint. As a result, the youth sustained an abrasion to his right temple.

OCFS' restraint policy prohibits staff from entering a youth's room to confront negative behavior except to prevent the youth from physically harming himself/herself; however, there was no evidence or claims by staff in any of the above three incidents that suggested that these youth were threatening or engaging in self-harm.

---

[3]     Youth Division Aide, known as a YDA for short, is a first-line custody staff position.

- 8 -

Staff pushed the pin when a youth refused to stop laughing loudly in the cafeteria after staff warned him several times to stop. Once the response team arrived, the youth was restrained, handcuffed, and removed from the cafeteria. The youth sustained a lip laceration, injuries to both wrists and elbows, and a bruise to his right upper arm.

In another incident, staff ordered a youth to get up from the table where he was sitting and stand next to him. The youth complied, but in so doing, reportedly glared at the staff and "invaded [their] space." The staff used force to place the youth in a sitting restraint.[4] Reportedly, the youth had fractured his collarbone at a prior placement, and it was re-injured during this incident.

The above examples illustrate that staff consistently respond to what appear to be, at least initially, minor incidents with a high degree of force. Interviews with staff revealed that they do not believe that they have options to respond to youth's behaviors. For example, according to both staff and youth, a common behavior that frequently results in a "pin push" is when a youth is "refusing to move." Reportedly, this includes a youth's refusal to get out of bed in the morning. When we asked a number of staff if there were any tactics, other than an escort, that they could use to address a situation where a youth refused to move, we consistently received responses such as: "I don't know," "nothing," or "just sit there and wait." In fact, staff informed us that recent measures to reduce restraints have put staff's safety at risk since their "hands are tied" and they are forced to just step aside when youth are defiant. While we trust that this is not OCFS' intent, this perception among staff is clearly problematic. The impact of resorting to the same failed method in confronting youth's behaviors is evidenced by the number of youth who have been restrained multiple times in a short time period, particularly those whose behaviors could be a result of mental health problems. For example:

One youth was restrained 11 times between January 3 and May 30, 2008. This youth was assigned to the mental health unit and has a habit of engaging in self-mutilating behavior when distressed. In eight of the 11 restraint incidents, she sustained injuries such as abrasions, shoulder/arm bruising, and swollen lips. Our review revealed that staff fail to engage in verbal strategies and too often employ a high degree of force to control her behavior.

---

[4]        A sitting or seated restraint is another OCFS-approved restraint technique. Basically, a sitting restraint involves staff securing the youth's arms while seated on the floor with his or her legs in front of the body and the staff behind the youth.

Another youth was restrained 13 times between January 3 and June 17, 2008. This youth had a history of arguing/fighting with her peers. One of the incidents, in which she was fully restrained for failing to follow staff's instruction to put her hands behind her back, resulted in bruises and abrasions to both of her arms. The restraint was precipitated by a YDA who, according to a YC,[5] entered the youth's room and started removing photographs from her wall. A second YC reported that the YDA "initiated a restraint that was too hasty," yet no immediate corrective action was taken. At the time of our tour, this incident had been referred for investigation and the outcome was still pending.

Another youth was restrained eight times between April 24 and June 25, 2008. This youth was assigned to a mental health unit and has a history of engaging in self-mutilation and suicidal gestures. In nearly every one of the eight incidents, the youth was engaging in behaviors such as head banging, putting paper clips in her mouth, tying a string around her neck, etc.; behaviors that, due to her mental illness, were beyond her control. Each of those incidents resulted in a full prone restraint, which is essentially punishment for exhibiting symptoms of her illness. Our experts (both in protection from harm and mental health) agreed that behavioral interventions would be more appropriate in these types of situations.

b.      Inappropriate Restraints

Our investigation revealed that restraints are used frequently and result in a high number of injuries. For instance, in 2007 at Lansing, the total number of restraints was 698, an average of 58 restraints per month. One hundred and twenty-three Lansing residents were injured as a result of restraints that year. These injuries included bruises, concussions, knocked out teeth, and fractures. Some of the injuries suffered by girls at Lansing have been quite severe. For example, in the first three and a half months of 2008, one youth suffered a left shoulder separation and a hairline fracture to her left arm from one incident, and another resident suffered a shoulder displacement in one incident and a spiral fracture to her left arm in another.

---

[5]      A Youth Counselor, known as a YC for short, is a custody staff member who supervises a unit. The level of authority is designated by a "I" or a "II" following the YC title.

- 10 -

The number and severity of injuries resulting from restraints is made worse by poorly executed or intentionally harmful restraints. Many youth, particularly at the Tryon facilities, explained to us that a typical, unauthorized restraint technique is for staff to "hook and trip"; in other words, staff restrain a youth's arms behind his or her back, then trip the youth's legs so they fall to the floor face first. This clearly incorrect method of restraining youth may account for some of the bruising to the chin, forehead, and cheeks and broken teeth described in incident reports. In addition, youth also frequently reported to us that staff often restrain a youth's arms behind his or her back, then pull forcefully up on the youth's arms, resulting in severe pain and discomfort in the shoulders and arms.

Even when staff are following approved practices, restraints can be dangerous. In particular, the use of prone restraints is controversial and has been banned by many facilities nationwide due to the high risk of serious injury or death.[6] In spite of the known risk of prone restraints, staff at the facilities are trained to use prone restraints. The danger of prone restraints is that if the individual's airway is constricted, he or she is unable to express physical distress. Further, the restrained individual's struggle for air may be misconstrued by staff as resistance, resulting in increased force on the restrained individual. Indeed, in November 2006, a 15-year-old resident at Tryon Boys died following a prone restraint. The youth allegedly pushed a staff member and was then pinned face-down on the floor and handcuffed by two staff. The youth stopped breathing only minutes later, and then died at a nearby hospital. His death was ruled a homicide by the medical examiner. Despite this tragic death, a dangerous combination of high rates of prone restraints and a low standard for initiating a restraint remains at the facilities.

Our expert reviewed a number of videos of incidents at Tryon Boys that were available during the tour. The videos we viewed showed staff applying force in ways that were both excessive and inappropriately executed. In one example, the force used was particularly dangerous:

> While staff were attending to a youth ("Y1") who was engaging in self-mutilation in his room, a second youth ("Y2") bolted from his room and headed down the hallway. Staff immediately used force to subdue Y2. None of the available staff took any actions to clear the other youths from the hallway or to secure the doorway of Y1. A third youth

---

[6]     The New York Department of Corrections and New York Office of Mental Health have already banned the use of prone restraints in adult correctional and mental health facilities. Dan Higgins, "Prone Restraint" Allowed at Youth Facilities, Albany Times Union, Nov. 22, 2006.

("Y3") came from his room and began kicking Y2, who was being restrained by staff on the floor and was unable to defend himself. Surprisingly, staff took no action to secure Y3. Y1 then exited his room. He was immediately placed in a choke hold by a YDA and taken to the ground. Additional staff began to arrive during the next five minutes, including the facility director, to assist in restraining Y2, yet no one assisted the YDA who was restraining Y1 in a choke hold nor told him to stop a clearly inappropriate restraint technique.

### 2.   Failure to Adequately Investigate Use of Force Incidents

Incident reviews and investigations are necessary to ensure that staff are following OCFS policy and that youth are protected from abuse. These investigations are essential to identify staff in need of training and/or discipline, as well as to clear staff who have been wrongfully accused. Poor investigations prevent facility administrators from spotting trends and taking the appropriate measures to correct them when necessary. The investigation process must have reasonable integrity, preserve all physical evidence (e.g., videotape footage, documentation and photographs of injuries, clothing, etc.), obtain statements from all youth and staff involved in the incident and those who witnessed the incident, and utilize other sources of information to corroborate or refute the allegation (e.g., logbooks, other sources of facility documentation).

Many of the investigations our expert reviewed were inadequate, both by agency and generally accepted professional standards. For example, some investigations were superficial and failed to include relevant evidence or any attempt to reconcile conflicting evidence. Some investigations were not conducted by detached investigators, which calls their reliability into question. The following examples illustrate the types of breakdowns in the incident review system that our expert observed during his review:

- An investigation was initiated upon a youth's allegations that a YDA used excessive force and threatened him. During the incident in question, the youth destroyed property in his room and was forcibly removed to the unit office by a YDA and a YCII. Once in the office, the YDA and YCII placed the youth in a prone restraint, reportedly due to the youth's "struggling." Later, the youth complained to his counselor that after the situation resolved and the YCII left the office, the YDA placed his forearm against his neck and threatened that "next time I am going to hurt you real bad." A YCI completed the investigation into the incident and concluded that the youth's allegations were unfounded. There were numerous flaws in this investigation, which include: i) the documents do not describe the justification for the use of

- 12 -

interview the YCII who was involved in the incident; iii) the YCII
involved in the incident signed off on the investigation as the Facility
Investigation Coordinator; and iv) a YCI was investigating a YCII, his
superior.

In the course of a restraint, a youth sustained a spiral arm fracture,
prompting an investigation. The incident began when the youth went
to his room and slammed the door. Staff pushed the pin and a
response team arrived. The youth was taken to the unit office and
counseled. He returned to his room where he began "rapping" and was
instructed by a YDA to sit in a chair in his doorway. The acting Case
Manager then ordered staff to: "Hook him up and escort him to the
office." This resulted in a full take-down restraint, during which the
youth sustained the spiral arm fracture. This investigation was
essentially never reviewed, because it was signed off on by the same
person who investigated the incident. In addition, the investigator
failed to explain how, despite his identification of a number of "errors
in judgment," he could "conclude" that, "It is not necessarily a
conclusion that his lack of procedure contributed to the injury."

Another investigation was initiated by a youth's allegation that a YDA
grabbed him and threw him into a gym divider (temporary wall) when
he refused to run in place. Despite statements by another YDA and
another youth that the YDA grabbed the youth by the shirt and
escorted him to the gym hallway, the investigator concluded that no
unnecessary force was used because there was no evidence that the
YDA threw the youth into a wall. Serious flaws in this investigation
include the investigator's failure to address the violation of OCFS's
policy against using "touch controls" when directing a youth, and the
investigator's failure to reconcile the YDA's statement that he never
touched the youth with evidence to the contrary.

In another alleged incident, a youth reported that, during a restraint,
staff pulled her to the ground by her hair. The investigation included
a written statement from another YDA who witnessed the incident
that a hair pull tactic was employed. The subject of the investigation
had an extensive disciplinary history, including use of force violations.
The investigator concluded that, although the YDA acted precipitously,
there "was not enough evidence to prove misconduct."
Notwithstanding the use of an unauthorized tactic, the YDA's
disciplinary history, and evidence that the YDA failed to wait for
assistance, the investigator merely recommended a counseling memo.

- 13 -

- An investigation was prompted when a youth, who wore purple laces to indicate that her medical status required that she only be restrained in a sitting position, was reportedly subjected to a full prone restraint. According to the incident report, the YDA responded to a call for all available staff to report to a housing unit due to an incident, and upon arrival found three youths yelling and screaming and "assumed they were fighting." The YDA placed the youth with purple laces into a full restraint, then placed her in a sitting restraint and applied handcuffs when he realized that she had purple laces. Photographs and the clinic report documented that she sustained bruising and swelling to her cheek, arm, and shoulder. This incident was reviewed, but no follow-up was recommended despite the injuries and the use of a full prone restraint on a youth with medical restrictions. Indeed, no inquiry was made related to whether the force was even necessary.

### 3.    Failure to Take Corrective Action Against Staff

Equally as important as an adequate system for reviewing incidents is prompt corrective action in response to staff misconduct. Contrary to generally accepted professional standards, administrators in the facilities take no action, impose actions that are inconsistent with the seriousness of the violation, or fail to impose action in a timely manner. The following incidents illustrate the various breakdowns:

- Facility investigators concluded that a YDA used excessive force on a youth that resulted in two broken teeth, lacerations, bruises, and welts after she was left in a restraint for 3-4 minutes. Reportedly, the YDA had to be told by another YDA to stop the restraint after the youth began bleeding from her mouth. An administrative review of this incident was conducted on December 3, 2007, however we were unable to find whether this employee was ever disciplined. Six months later there was no indication of disciplinary action or retraining.

- A youth alleged that a YDA called him a "pussy" and threw him to the ground, causing a laceration to his chin that required sutures. The allegations were sustained and the YDA was recommended for termination. The YDA had three prior use of force violations on his record, one of which included fracturing a youth's shoulder. The facility recommended termination, however the union achieved the following settlement: Letter of Reprimand, fine of $800 to be taken in ten increments, and suspension of two weeks to be held in abeyance to be taken upon repetition of the same or similar acts within one year.

- 14 -

Facility investigators investigated an incident involving a youth who was restrained for threatening to urinate on the floor. She sustained a concussion, vomited, urinated, and defecated when she was forcibly taken to the floor by a male staff who reportedly weighed in excess of 300 pounds. Inconceivably, the facility investigator concluded that the force was not excessive. However, the investigator also found that "this restraint could have been avoided had [the YDA] waited for assistance to come to his unit" and sustained a finding of Inappropriate Custodial Conduct. When our expert inquired as to the disposition of this case, we were provided a memorandum from the Facility Director to the Director of Labor Relations recommending that a "Counseling Memorandum be placed in [the YDA's] personal history file." However, we were then advised that this recommendation was a newly-discovered "clerical mistake" and the Facility Director had really intended to request that disciplinary action be taken against the staff.

A youth alleged that she was restrained for taking a cookie without permission during evening snack time. The investigator concluded that the YDA who "hooked up" the youth, did so unnecessarily, and noted that the YDA had "several disciplines relating to inappropriate handling of residents." One year later, sanctions were imposed pursuant to a settlement that included a "Letter of Reprimand" and a "fine of 3 days pay to be taken in the form of accruals." One year is far too long a delay to arrive at a disposition on an incident involving a staff member who had been disciplined previously for misconduct and who had youth contact during this time.

Another investigation resulted in a finding that a YDA inappropriately entered a youth's room and used unnecessary force. After the incident, the youth complained of a swollen jaw and an injured wrist. The investigation noted that this YDA had a "lengthy institutional abuse history that includes six other indicated reports regarding four separate incidents from November 2004 through April 2006," however, six months later this YDA remained employed at the facility.

A youth alleged that a YDA dragged her from her bed and restrained her, causing her to sustain lacerations, bruises, and welts. The investigation found that the YDA used unnecessary force and fabricated evidence during the course of the investigation. The investigation was completed on August 14, 2007 and administratively reviewed on February 8, 2008, almost six months later. Four months after that, the YDA remained employed at the facility.

- 15 -

B.    Failure to Provide Adequate Mental Health Care and Treatment

The State has an obligation to provide adequate mental health treatment to confined juveniles. See Youngberg, 457 U.S. at 323-24 & n.30. We find that the mental health care at Lansing, Gossett, Tryon Boys, and Tryon Girls substantially departs from generally accepted professional standards. Specifically, we find that: 1)inadequate behavioral management has led to an over-reliance on restraints and other forms of punishment to control youth's behaviors; 2) evaluation and diagnoses are inadequate; 3) the facility follows poor medication administration; 4) treatment planning is inadequate; and 5) substance abuse treatment is insufficient.

### 1.    Failure To Provide Adequate Behavioral Management

Generally accepted professional standards require that juvenile justice facilities establish individualized behavior management programs to address the problematic behavior of youths with mental illness.  Behavior management programs should include plans and strategies to address mental health crises and reduce their potential for recurrence.  Staff employed at juvenile justice facilities should be trained in crisis intervention and de-escalation techniques, and should utilize the least restrictive measures necessary when a youth with mental illness acts out.  Physical restraints should be used as an infrequent last resort.

Our investigation revealed that, while some attempts had been made to establish individual behavior management plans for youth with mental illness, the facilities failed to address problematic behavior and mental health crises with the least restrictive measures.  Restraints were the standard for controlling behavior at all four facilities, and youths with mental illness were restrained more often than other youth.  This was particularly acute at the two Tryon facilities.  At Tryon Boys, youth with mental illness, who represented 50% of the population, were involved in 82% of the restraint episodes.  At Tryon Girls, youth with mental illness, who represented 48% of the population, were involved in 60% of the restraint episodes.

During our tours, we reviewed records and directly observed youth with serious mental health problems that neither clinicians nor staff knew how to address.  The harm resulting from the failure to provide adequate behavioral management is clearly illustrated by the case of the following youth:

- We discovered during our tour that this youth had been placed on a living unit by herself since August 2008 (approximately three months). Apparently in fear for the safety of others, and with no tools to address the youth's extremely challenging behavior, staff had virtually abandoned this youth.  Her records and interviews with staff describe

- 16 -

complex behavioral problems and symptoms of a very serious mental
illness which the facility was unable to address.

The youth was aggressive and assaultive, went through periods where
she did not attend to her basic hygiene (including urinating and
defecating on the floor of her room), refused to participate in activities,
and refused medication. She had been taken to the emergency room on
several occasions for forced injections and had been incarcerated in the
local jail after injuring a staff person.

At the time of our November tour, this youth's mental health
treatment (as well as her education) were effectively on hold. She
never left her housing unit because she did not want to, and would
only allow certain YDAs to work with her. She refused to attend
school, refused to speak with her assigned counselor, and refused to
take her psychotropic medication. She simply remained in the living
unit in her pajamas. Her mental health treatment providers expressed
concern for the youth's welfare but were clearly very frustrated by the
lack of tools to address her complex behavioral problems. Although the
problems with the youth had been ongoing, and she had lived in her
own cottage for three months, the facility was at a loss for how to
address her problems. She had been restrained by staff 15 times in the
course of a little more than three months.

Another case involving a different youth further illustrates staff's ineffective
efforts to address self-injurious behavior:

· According to staff, the youth had experienced a negative phone call
with his family, and thereafter began rubbing raw a scratch on his
finger. He was moved from his housing unit to the medical infirmary.
The incident occurred in the evening, when mental health staff were
no longer at the facility. Custody staff tried to convince him to stop
hurting his finger, but the youth simply stared back at them mute and
without expression. Staff attempted to stop his self-injurious behavior
by standing over him, directing him to stop, asking why we was
hurting himself, holding his hand up away from his body, and applying
bandages. These actions were ineffective, and ultimately he was
placed in handcuffs and shackles and transported to a local emergency
room for an evaluation.

Youth who engage in self-injurious behavior are typically experiencing
emotional pain for which they do not have appropriate coping skills. Most
professionals would recommend that during this type of crisis, staff sit quietly with

- 17 -

the youth and empathize with his or her emotional pain (provided that the youth is not seriously injuring him or herself). It is impossible to teach new strategies to replace maladaptive coping strategies during the crisis. Later, staff should work with the youth in treatment to teach healthy coping strategies and to address specific issues which lead to crises. The crisis management plan for the youth should include efforts to reduce the potential for reoccurrence, through psychiatric treatment, treatment planning, behavioral modification, and environmental changes.

> 2.   **Failure to Properly Evaluate and Diagnose Mental Health Problems**

Professional standards for the care of youth in juvenile justice facilities require that youth be evaluated by a psychiatrist for mental health problems, that those evaluations include specific information, and that the psychiatrist and other mental health treatment providers work with the youth based on agreed-upon diagnoses.

The psychiatric evaluation should include a review of: current mental status; the history of the present illness; psychiatric history; medical history; family history; current medications and response to them; history of treatment with medications and response; medication allergies; social history; substance abuse history; interviews of parents or guardians; and a review of prior mental health records. Psychiatric evaluations serve as the foundation for determining a youth's diagnosis and what type of treatment is appropriate, including whether psychotropic medication should be used. The evaluation should document how symptoms meet diagnostic criteria for any specific diagnosis, and should include an explanation and justification for the given diagnosis.

The majority of psychiatric evaluations at the four facilities did not come close to meeting the criteria described above. The evaluations typically lacked basic, necessary information, including justification for the diagnosis and evidence of prior record review. As a consequence, the treatment of youth with serious mental illness was based on poor information and was generally ineffective. The harm resulting from the failure to adequately assess a youth's psychiatric status is illustrated by the following example:

> •   A youth was diagnosed with Oppositional Defiant Disorder and a possible mood disorder based on the initial psychiatric evaluation at the facility. However, the evaluation failed to document what symptoms indicated the diagnoses, and there was no evidence that staff had reviewed evaluations from the youth's prior placements. If facility staff had reviewed prior evaluations of the youth, they would

have learned crucial details which may have guided an effective
treatment program. The prior evaluations detailed a history of
significant trauma, including severe parental abuse and neglect. Two
prior placements diagnosed him with Posttraumatic Stress Disorder
("PTSD").

During his commitment at the facility, the youth experienced
difficulties, including several physical restraints due to his aggression
"after conflict with staff." It is likely that his aggression following
conflicts with adults is triggered by his history of trauma, which none
of the facility's health providers nor treatment team were addressing.

The failure at Gossett, Lansing, Tryon Boys, and Tryon Girls to conduct
proper psychiatric evaluations is compounded by the fact that youth frequently are
assigned several different diagnoses at the same facility. It was not uncommon to
find that the psychiatrist, other mental health treatment providers, and a youth's
treatment plan each assigned a different diagnosis to the same youth. It is difficult,
if not impossible, to develop a cohesive treatment strategy when the treatment
providers do not even agree on the youth's problems. To further complicate
matters, youth at Gossett, Lansing, and Tryon Boys had been evaluated at a
reception center prior to their transfer, which then added a fourth diagnosis to the
equation.[7]

Failing to properly evaluate and diagnose mental health problems results in
ineffective treatment and harm to youth. For example:

> One 16-year-old resident was given one diagnosis by the psychiatrist,
> and a different diagnosis by her counselor. There was no explanation
> of how her symptoms met the criteria for either diagnosis, and her
> treatment seemed ineffective in addressing her issues. The evaluation
> from the reception center discussed the youth's history of physical
> abuse, exposure to domestic violence, and childhood sexual abuse. She
> was diagnosed at the reception center with Bipolar Disorder, PTSD,
> and Conduct Disorder.

---

[7]     The same psychiatrist who completes the intake assessment for female
youth at the reception center provides the ongoing treatment of many of the youth
who are placed at Tryon Girls. As a result, the youth's diagnosis from the reception
center and the psychiatrist's diagnosis at Tryon Girls were generally consistent.
However, the same problems with different diagnoses from the psychiatrist, the
mental health treatment provider, and the treatment plan exist at Tryon Girls.

- 19 -

Upon arrival at Lansing in August 2008, there was a cursory intake psychiatric evaluation. The evaluation noted that the youth had a history of family violence, hospitalizations resulting from aggression or suicidality, nightmares, flashbacks, panic attacks, and possible dissociation. She was diagnosed with Conduct Disorder, without any discussion of how her symptoms met the diagnostic criteria. In September 2008, an unsigned mental health assessment in the youth's records reported that she demonstrated high agitation and labile affect,[8] and diagnosed her with a mood disorder. During this time, she was prescribed – without justification – a psychotropic medication not indicated for the treatment of Conduct Disorder or a mood disorder.

Counseling notes from this time period state that the youth had experienced flashbacks due to past parental abuse, and that when she was restrained by staff, this would escalate into an assault on the staff. The counselor noted that the youth has "a problem with close contact when angry" and needs "quiet time to calm down appropriately." However, this astute observation was not addressed in the youth's treatment plan, and staff continued to frequently restrain her – 16 times in less than two months.

### 3.    Inappropriate Medication Practices

If psychotropic medications are used, generally accepted professional standards require that youth be properly assessed and that medications be prescribed based on identified target symptoms and a known benefit to treat those symptoms, based on a valid diagnosis and understanding of the root causes of the illness. The psychiatrist should provide ongoing management and monitoring of the youth's symptoms and the effectiveness of the medication. Medication changes should follow documented monitoring of the effects of previous medication choices and reasons for abandoning a previous medication regimen. Because many psychotropic medications may cause harmful side effects, careful monitoring through laboratory tests is often necessary.

### a.    Prescription and monitoring of medications

Each psychotropic medication prescribed should treat specific target symptoms exhibited by a youth, insofar as these symptoms relate to a specific psychiatric diagnosis. The effect of medication on the target symptoms should be

---

[8]    "Labile affect" refers to rapid shifts of outward emotional expression, such as changing quickly from laughing to crying.

carefully monitored, and adjusted, if needed, if the target symptoms do not improve. Without an individual and symptom-specific rationale for the use of psychotropic medications, medication may be inappropriately used for sedation, especially where multiple medications are used.

Across the four facilities, there was a pervasive lack of documentation of either the target symptoms for the medications or monitoring of the effectiveness (or lack thereof) of medication on those target symptoms.

- One 15-year-old youth was on six psychotropic medications at the time of our tour. We were unable to determine from his records either his agreed-upon psychiatric diagnoses or the target symptoms for the six medications. The youth was diagnosed by the facility's psychiatrist with Oppositional Defiant Disorder, but there was little documentation of review of symptoms other than the word "sleep" with a check mark beside it, and notes stating: "[N]o psychosis/mania. Mood OK, affect fine . . . does not appear depressed/anxious." His diagnoses on the treatment plan were listed as Oppositional Defiant Disorder, Attention Deficit Hyperactivity Disorder ("ADHD"), Bipolar Disorder, parent/child relational problem, and cannabis abuse. These diagnoses were not reflected in the psychiatric progress notes.

  In addition to the lack of documented rationale for the various diagnoses of the youth and the prescription of multiple psychotropic medications, the apparent ineffectiveness of his treatment went unaddressed. He continued to exhibit challenging behavior, including losing his temper and defiance. He was restrained on six occasions in the span of three months. In one incident, the youth began shouting and banging on the door of his room. He was physically moved from his room and ultimately placed in a full prone restraint, then restrained with handcuffs for 20 minutes. In another incident, the youth was placed in a full prone restraint for refusing to follow the rules during recreation, and was placed in isolation. During isolation, he repeatedly banged his head on the wall. As a result of the restraint, he suffered facial abrasions and pain to his shoulders. There were no changes in the youth's medications following these incidents.

b.    Monitoring for side effects

Psychotropic medications may cause adverse, and sometimes serious, side effects. Therefore, generally accepted professional standards require routine monitoring for potential side effects, including abnormal involuntary movement

- 21 -

monitoring; routine laboratory examinations, including medication levels and electrocardiograms; vital sign monitoring; and weight monitoring.

Our review of the four facilities' psychotropic medication practices showed substantial departures from generally accepted professional standards. Our expert consultant did not find any charts where youth were being monitored for abnormal involuntary movement. In interviews, the psychiatrists confirmed that they did not routinely monitor for involuntary movements but one agreed that "it would probably be a good idea." In addition, there are no system-wide protocols specifying which medications require which laboratory examinations. Where laboratory examinations were conducted, they omitted critical information. For example:

> One youth was prescribed multiple psychotropic medications. The laboratory examinations appropriately included testing of blood sugar and liver function, but omitted a complete blood count and medication level. (One of the drugs prescribed to the youth can cause a decrease in platelets, among other serious side effects.) In subsequent psychiatric progress notes, there was no evidence that the results of the requested tests were ever reviewed by the psychiatrist. The failure to test for serious side effects and the failure to review the results of the tests placed this youth at serious risk of harm.

### c. Medication refusal documentation at Tryon Boys

Once a youth assents to treatment with psychotropic medication and other informed consent requirements are met, the medication should be administered according to the agreed-upon regimen by trained medical staff qualified to dispense medications. If a youth refuses medication, standards of care require that the youth state the refusal to the medical staff responsible for dispensing the medication, and that the youth should sign a refusal document stating why he or she is refusing. A youth's refusal should be communicated to mental health staff, including the treating psychiatrist, so they can discuss the risks of non-adherence with the youth as well as discuss any other concerns, such as unpleasant side effects.

At Tryon Boys, documentation showed a disproportionately high rate of medication "no shows" without a notification by the youth to medical staff, signed refusal form, or follow-up by mental health staff. For example:

> One youth who was prescribed three psychotropic medications was a "no show" for medications on 13 occasions between November 1 and 19, 2008. Non-compliance with these medications could result in serious side effects. Specifically, rapid reduction of one of the medications can result in seizures, and a rapid reduction of another of

- 22 -

the prescribed medications can cause a severe increase in blood pressure. Moreover, the youth's psychiatric symptoms and problematic behavior appeared to be escalating even before the extended period of medication non-compliance in November, and then worsened, resulting in staff restraining him with increasing frequency. Despite these clear signs of problems with the youth's mental health and behavior, nothing in the psychiatric progress notes addresses either medication non-adherence or the restraint episodes.

Notably, the medication administration records of youth who refused medication indicated that medical staff "encouraged" custody staff to bring youth for medications, but when a youth failed to appear, it was custody staff – not the youth – who told medical staff. While youth have the right to refuse medication, allowing youth to simply decline medication verbally to custody staff impedes access to care. It inhibits medical staff from getting the information they need to determine why the youth is refusing medication, and to discuss with the youth whether non-adherence to treatment is the best choice. In addition, it opens the door to custody staff making decisions about taking youth to receive medications based on convenience or perceived understaffing.

### d.   Informed consent

Informed consent is necessary prior to the prescription of psychotropic medication for any patient, but it is particularly critical in child and adolescent treatment. There are few psychotropic medications approved by the U.S. Food and Drug Administration for the treatment of youth, and a paucity of controlled studies addressing the efficacy and safety of the use of psychotropic medication in this population.

According to generally accepted professional standards, the following information should be provided to the youth and to his or her parents or guardians by an individual with prescriptive authority: (1) the purpose/benefit of the treatment; (2) a description of the treatment process; (3) an explanation of the risks of the treatment; (4) a statement of alternative treatments, including treatment without medication; and (5) a statement of the unknown risks of the medications.

Informed consent procedures at the four facilities substantially depart from generally accepted professional standards. We found that, in practice, staff members calling the parent/guardian to obtain informed consent typically did not have prescriptive authority, and therefore were not able to discuss the medication with the parent/guardian. Consent obtained in this manner is not "informed." Each facility's informed consent process relied on professionals without prescribing authority to contact the parent/guardian for verbal consent.

- 23 -

Policy Number LGC 3243.14 in the Gossett Facility Operations Manual defines "mental health clinician" to include a social worker, psychiatric/community mental health nurse, psychologist or psychiatrist. Further, the policy provides that:

> At no time during this process is the clinician expected to enter into an independent discussion with the parent/guardian as to the risk and benefits of the prescribed medication(s). If the parent/guardian wishes to discuss the risks/benefits of medications, arrangements must be made for the parent/guardian to have the opportunity to speak with the prescribing physician . . . no longer than two weeks from the time requested.

### 4. Inadequate Treatment Planning

In order for youth to receive adequate mental health treatment, they must be provided adequate treatment plans that guide their care. All of a youth's mental health treatment providers, including the psychiatrist, should agree on the youth's diagnosis, identify what problems need to be addressed and what may be causing those problems, and develop goals with the youth on how to work on those problems. The treatment plan should be written in language which the youth understands. The youth, psychiatrist, other mental health treatment providers, and other facility staff, such as teachers and custody staff, who know the youth should all be included as members of the treatment team. In addition, the treatment team should revise the plan, including the youth's diagnosis, as the youth progresses and the team learns more about the youth. If the treatment plan is not helping, then it should be revised.

The treatment plans at all four facilities substantially departed from these standards. Many youths had complex mental health needs documented in their records, but the treatment plans were superficial, generalized, and in jargon which the youths did not understand. For example:

> • One 16-year-old youth's mental health history and risk factors (which were described in detail in the evaluation from a reception center) include psychiatric hospitalization, a history of deaths of family members and friends, significant social skill deficits, low cognitive functioning, low academic level, daily drug use, depression, and hopelessness. He was diagnosed at the reception center with ADHD, PTSD, Conduct Disorder, a mood disorder, a learning disorder, borderline intellectual functioning, and drug abuse. Clinicians would generally recommend that a youth exhibiting such symptoms of PTSD and learning disabilities must be helped to: (1) understand his trauma as the source of his anger and recover from this trauma, and (2) understand his cognitive impairments and how to compensate for

- 24 -

them so that they do not adversely affect his emotions, relationships
with peers, and ability to follow directions. However, the treatment
plan goals were vague, simplistic, and did not address the youth's
underlying problems in any meaningful way. His mental health goals
included "cooperat[ing] with psychiatric evaluation and medication for
ADHD and anger dysregulation" and "regulat[ing] emotions on unit,
display increased cooperation with staff and refrain from aggression
toward peers."

The composition of the treatment team is a fundamental element of
treatment planning. However, the treatment teams generally lacked critical
members, most often the youth and the psychiatrist. One psychiatrist described his
role as "an outsider" and expressed frustration because, "I have to beg, borrow, and
steal information."

Treatment planning at the four facilities is further hindered by a maze of
uncoordinated plans and goals for the youth (in addition to the treatment plan
itself). On the living units, each youth has a binder called a Youth Development
Log ("YDL") which contains a variety of materials, including the Resident Behavior
Assessment ("RBA") and, sometimes, the Behavior Improvement Plan ("BIP"). The
RBA contains "focus items" which are intended to be behavioral interventions, and
also includes items that youth's staff mentors are required to rate the youth on
weekly. A second binder includes, among other items, the mental health treatment
plan and the psychiatrist's notes. The school has its own records, including the
Individualized Education Plan.[9] If a youth is involved in substance abuse
treatment, it appears that the plans related to substance abuse are separate. These
plans each operate without reference to the others.

Our investigation found that the RBA seemed to take precedence over
treatment planning. The RBA is a boilerplate form that requires staff to choose
which statements reflect the youth's behavior, such as "Models and promotes the
use of non-violent alternatives for resolving conflicts," and "Regularly lies to avoid
punishment or blame." The main focus of the RBA appears to be behavior control.
In observing four different treatment team meetings during our tours, the focus in
each meeting was on the RBA, with little or no acknowledgment of the treatment
plan.

---

[9]     The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §
1400 et seq., requires the development of Individual Education Plans ("IEP") for
qualifying youths with disabilties. The IEP should include information about a
youth's diabilities, including mental illness.

In addition, generally accepted professional standards require treatment planning to be a coordinated and dynamic process. Treatment plan goals should be revised as necessary based on the youth's behavior and accomplishments, any changes in the working psychiatric diagnosis, and any other developments, such as new information provided by the youth about drug use, abuse history, or other issues. However, treatment planning is so fragmented that staff fail to communicate crucial details about youth's behaviors and symptoms to other staff. For example:

- A youth told us that he feels persecuted and ostracized at the facility due to his medical and mental health problems. In addition to his psychiatric illness, this youth suffers from a serious urological problem. In October 2008, he was seen at the clinic for vomiting and other symptoms, which he mistakenly believed were caused by pregnancy. The exam notes state that the youth may be delusional. Despite this significant incident, it appears that the youth's belief that he was pregnant and the possibility that he was delusional was not communicated to the treating psychiatrist. It is unknown whether this was addressed in the youth's individual therapy. (Because the youth's assigned counselor is employed by the State Office of Mental Health, rather than OCFS, the individual therapy notes are filed separately from OCFS documents, further hindering the goal of integrated treatment planning.) A cohesive, comprehensive treatment plan for this youth would be invaluable not only to the treatment team, but also to other staff who attempt to address his behavioral and mental health challenges on a daily basis. Instead of productive interventions, custody staff had resorted to restraining him.

- Another youth's assessment documented her depression and anger. Before being placed in the facility, she had been the victim of a serious sexual assault, had been placed in a psychiatric hospital, and had been suspended from school for fighting. The facility psychiatrist recommended that the youth receive psychotherapy in order to address her past trauma. Her single, simplistic treatment goal was: "Youth will identify one way that her behavior has consequences for her and for others" and listed the same treatment modalities as for any other youth at the facility. Several days after her treatment plan was completed, the youth attempted to hang herself with a shoelace. In a suicide risk evaluation following this incident, the youth asserted that "as long as she is feeling this bad, she will try to kill herself." Despite these signs of serious mental distress, her treatment plan remained unchanged following the suicide attempt.

- 26 -

Many youth at the four facilities had well-documented trauma that was left untreated and unaddressed in treatment planning. We found that in attempting to control youth behavior through commands and the threat of restraints, staff unintentionally triggered traumatized youth, who reacted with escalating anxiety, angry outbursts, or aggression. Traumatized youth interpreted staff's action as attempts to victimize them. To address the unique needs of traumatized youths, treatment planning consistent with the standard of care would include developing multi-disciplinary interventions so that staff do not escalate youth's reactions or further traumatize them, and so that the youths learn to use coping skills. Failing to help these youths with past trauma means that they will probably continue to be reactive and aggressive upon their return to the community. In the short-term, failing to treat their trauma often results in staff unwittingly triggering this aggression. At these facilities, this aggression is controlled by restraining youth. For example:

- One 17-year-old youth was being treated for PTSD. She has a history of sexual abuse, and experiences flashbacks, anxiety, hypervigilance, and affective instability as part of her mental illness. Her simplistic treatment plan goals include reducing aggression, reducing anxiety, and developing coping skills. There is no reference to the likely connection between her traumatic experiences and reactivity nor an individualized strategy to help her develop appropriate coping skills. Similarly, the focus of unit staff is on her aggression and her IEP describes her as "disruptive, argumentative and aggressive ... rude, disrespectful, loud, obnoxious" and notes that she is easily distracted, requires one-on-one assistance, has a short memory span and trouble following verbal and written direction. Unsurprisingly, the failure to address her past trauma and its effect on her reactivity and anxiety or her learning problems has harmed this youth. In the five months since she had arrived at the facility, she had been restrained approximately two times each month.

### 5.   Insufficient programming to address youth's substance abuse issues

Generally accepted professional standards require that juvenile justice facilities address the substance abuse needs of youth in their custody. OCFS staff stated that the youth in the New York system with the highest risk level for substance abuse disorders are placed in specific facilities with substance abuse treatment programs. Tryon Boys is one such facility.

Our review of youth records found that most youth were not identified as having substance abuse problems. It is unlikely that the vast majority of youth at

these four facilities do not have substance abuse or dependence problems. Typically, drug use is a factor in the actions which lead to youth's detainment in juvenile justice facilities. Moreover, our record review found youths whose histories specifically indicated drug use issues who were not being treated for substance abuse problems. For example:

- One youth has a self-reported history of daily marijuana use, and indicated that her father also has a substance abuse history. She was diagnosed in the initial facility psychiatric evaluation with Cannabis Abuse (among other diagnoses). She was not, however, referred for any substance abuse treatment.

- Another youth self-reported that she used marijuana daily and frequently used alcohol. The reception center's assessment gave her preliminary diagnoses of Cannabis Dependence (in remission due to placement in a controlled environment) and Alcohol Abuse. But the facility's assessments included no mention of a substance abuse or dependence diagnosis or her history of drug use.

In addition, there appears to be an artificial separation between youth's mental health diagnoses and substance abuse disorders; youths with both problems were typically diagnosed either with a mental health diagnosis or a substance abuse problem, but not both. There is high co-morbidity between mental illness and substance abuse, and to treat one and ignore the other effectively treats neither issue. The high rate of substance abuse by traumatized youth is well-documented. This is often a maladaptive coping mechanism, in which the substances are used to soothe and numb feelings and memories associated with the trauma. Thus, excluding treatment of trauma from substance abuse treatment in such cases is problematic.

- For example, one 17-year-old resident's initial psychiatric diagnosis at the facility was PTSD. He was later moved into a different housing unit for substance abuse treatment, and his diagnosis changed to alcohol abuse, cannabis dependence, depressive disorder, and conduct disorder. Treatment for the trauma of PTSD was inexplicably dropped.

The failure of the facilities to address the substance abuse needs of youth deviates substantially from the standard of care.

- 28 -

## III.   REMEDIAL MEASURES

In order to rectify the identified deficiencies and protect the constitutional rights of the youth confined at Gossett, Lansing, Tryon Boys, and Tryon Girls, OCFS should implement, at a minimum, the following measures:

### A.   Protection of Youth From Harm

1.    Ensure that youth are adequately protected from excessive use of force by staff.

2.    Ensure that youth are not subjected to undue restraints, that restraints are used only when a youth presents a clear danger to him/herself or others, and that restraints are never used to punish youth.

3.    Ensure that the use of physical restraint is limited to exceptional circumstances when all other pro-active, non-physical behavior management techniques have been tried and failed, and that in the limited circumstances when physical restraint is necessary, staff shall employ only the minimum amount of physical control necessary to stabilize the situation.  Revoke all memorandums or directives to "push the pin" when youth shows any sign of resistance, including the December 18, 2007 Gossett memorandum.  Ensure that staff understand that such guidance is no longer in effect.

4.    Review the use of physical restraint techniques, including the use of face-down restraints, to determine whether the practices should be eliminated or modified in order to conform to generally accepted professional standards.  If face-down restraints continue to be used, develop procedures which require that trained staff shall monitor youths in restraints for signs of physical distress and ensure that restrained youths are able to speak.  Ensure that staff are adequately trained in physical restraint techniques, procedures to monitor the safety and health of youths while restrained, and first aid and CPR. Ensure that only those staff whose training is current in the above procedures are authorized to utilize physical restraints.

5.    Provide adequate training and supervision to staff in all areas necessary for the safe and effective performance of job duties, including training in child abuse reporting; in the safe and appropriate use of force and physical restraint; in the use of force continuum; and in crisis intervention and de-escalation techniques.

- 29 -

Routinely provide refresher training as required by generally accepted professional standards.

'6.     Ensure that all allegations of child abuse and mistreatment are promptly referred to the appropriate authorities.

7.      Ensure that serious incidents, allegations of abuse, and allegations of staff misconduct are adequately and timely investigated by neutral investigators with no involvement or interest in the underlying event. Ensure that staff who are the subject of an allegation of abuse be removed from direct youth supervision pending the outcome of the referral or investigation.

8.      Ensure that facility administrators take prompt and appropriate corrective measures in response to staff misconduct.

B.     Mental Health Care

1.      Provide adequate mental health and rehabilitative treatment.

2.      Ensure that there is an adequate, appropriate, and effective behavior management system in place, and that the system is regularly reviewed and modified in accordance with evidence-based principles.

3.      Train all staff, including custody staff, on appropriate strategies to address youth's mental health crises, including crises resulting in self-injurious behaviors.  Develop policies and procedures for contacting mental health treatment providers outside of regular working hours in the event of a youth's mental health crisis.

4.      Ensure that psychiatric evaluations comply with generally accepted professional standards, including review of youth's prior records and identification of how the youth's symptoms meet diagnostic criteria for the diagnosis.

5.      Ensure that the mental health treatment providers, including the psychiatrists, develop a uniform working diagnosis for each youth.

6.      Ensure that prescription of psychotropic medications is tied to specific target symptoms, and that youth records reflect the rationale for prescription of every medication, the target symptoms intended to be treated by the medication, and monitoring of the effectiveness of the medication on the target symptoms.

- 30 -

7.   Ensure that the following information is provided to youth and to his or her parents or guardians by an individual with prescriptive authority:  (1) the purpose/benefit of the treatment; (2) a description of the treatment process; (3) an explanation of the risks of the treatment; (4) a statement of alternative treatments, including non-treatment with medication; and (5) a statement of the unknown risks of the medications.

8.   Develop and implement system-wide protocols for routine monitoring, including laboratory examinations and side effect monitoring, for each psychotropic medication prescribed.  Ensure that monitoring is completed in accordance with generally accepted professional standards, and that results are adequately reviewed by each youth's psychiatrist.

9.   Ensure that youth's refusals of psychotropic medication is communicated to medical staff directly by the youth, that the youth signs a refusal form, and that the youth's refusal of medication is communicated to his or her mental health treatment providers.

10.   Revise system-wide policy and procedure for obtaining informed consent for psychotropic medications in accordance with generally accepted professional standards.

11.   Develop and maintain adequate formal treatment planning in accordance with generally accepted professional standards.  Ensure that treatment planning focuses on the youth's treatment plan, not collateral documents such as the "Resident Behavior Assessment."  If a youth has a history of trauma, ensure that treatment planning recognizes and addresses youth's history of trauma and its impact.

12.   Ensure that treatment teams include the youth and the youth's psychiatrist in addition to other appropriate staff.

13.   Ensure that all youth who have problems with substance abuse or dependence are provided adequate treatment for those problems.

14.   Ensure that youth whose serious mental health needs cannot be met at the facilities are promptly transferred to appropriate settings that meet their needs.

* * * * *

- 31 -

Please note that this findings letter is a public document. It will be posted on the Civil Rights Division's website. While we will provide a copy of this letter to any individual or entity upon request, as a matter of courtesy, we will not post this letter on the Civil Rights Division's website until 10 calendar days from the date of this letter.

The collaborative approach the parties have taken thus far has been productive. We hope to continue working with OCFS in an amicable and cooperative fashion to resolve our outstanding concerns. Provided that our cooperative relationship continues, we will forward our expert consultants' reports under separate cover. These reports are not public documents. Although our expert consultants' reports are their work – and do not necessarily represent the official conclusions of the Department of Justice – their observations, analyses, and recommendations provide further elaboration of the issues discussed in this letter and offer practical, technical assistance in addressing them. We hope that you will give this information careful consideration and that it will assist in your efforts at prompt remediation.

We are obligated by statute to advise you that, in the unexpected event that we are unable to reach a resolution regarding our concerns, within 49 days after your receipt of this letter, the Attorney General is authorized to initiate a lawsuit pursuant to CRIPA, to correct deficiencies of the kind identified in this letter. See 42 U.S.C. § 1997b(a)(1). We would very much prefer, however, to resolve this matter by working cooperatively with you.

Accordingly, the lawyers assigned to this matter will be contacting the attorneys for OCFS to discuss next steps in further detail. If you have any questions regarding this letter, please call Shanetta Y. Cutlar, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-0195.

Sincerely,

Loretta King

Loretta King
Acting Assistant Attorney General

cc:   The Honorable Andrew M. Cuomo
      Attorney General
      State of New York

- 32 -

Gladys Carrión, Esquire
Commissioner
Office of Children and Family Services

Karen Walker Bryce
Deputy Commissioner and General Counsel
Office of Children and Family Services

Annette Larrier
Facility Director
Lansing Residential Center

Rod White
Facility Director
Louis Gossett, Jr. Residential Center

Anita Sapil
Facility Director
Tryon Girls Center

Joseph Impicciatore
Facility Director
Tryon Residential Center

Glenn T. Suddaby
United States Attorney
Northern District of New York